## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| LORRAINE C. EAST, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:10-CV-85-PRC |
| | ) | |
| LAKE COUNTY COMMUNITY | ) | |
| CORRECTIONS and CHET FARRELL, | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 42], filed by Defendants Lake County Community Corrections ("LCCC") and Chet Farrell. Defendants seek summary judgment in their favor on all claims in Plaintiff's Compliant. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

### PROCEDURAL BACKGROUND

On February 18, 2010, Ms. East filed a Pro Se Employment Discrimination Complaint against LCCC, Mr. Farrell, and Lea Johnson, brought under Title VII of the Civil Rights Act of 1964, as amended. Therein, Ms. East indicated that she filed a charge of discrimination with the Equal Employment Opportunity Commission and that she received a Right to Sue Notice.

On March 30, 2010, Defendants filed a Motion to Dismiss. On July 15, 2010, the Court granted in part and denied in part the motion, dismissing all claims except for the 42 U.S.C. § 1983 equal protection claim against Mr. Farrell in his individual capacity.

On December 4, 2010, counsel entered an appearance on behalf of Ms. East, and on December 15, 2010, Ms. East filed a Motion for Extension of Time to Amend Pleadings, which the Court granted. On January 16, 2011, Ms. East filed a Motion to Amend Complaint, which the Court granted on February 7, 2011.

On February 8, 2011, Ms. East filed her Amended Complaint, by counsel, against LCCC and Mr. Farrell.  Therein, Ms. East alleges that she was discriminated against based on her sex and was discharged from her employment with LCCC in retaliation for protected activity.  Specifically, she alleges (a) sex discrimination based on Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., and on her equal protection rights under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 and (b) retaliation based on Title VII and on the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.  Defendants filed an Answer on March 1, 2011.

Defendants filed the instant Motion for Summary Judgment, a memorandum in support, and exhibits on July 14, 2011. Ms. East filed a Memorandum in Opposition on August 10, 2011. Defendants filed their Reply Brief on August 31, 2011.  On September 3, 2011, Plaintiff filed a Motion for Leave to File Response to Hearsay Objection, which the Court granted.  On September 14, 2011, Plaintiff filed a Memorandum in Opposition to the hearsay objection.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

3

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## EVIDENTIARY RULING

In support of her opposition to summary judgment, Ms. East offers her sworn deposition testimony that "the last time I talked to Mr. Johns, he said he was aware that I was approved to come over to work for him; but when he checked with Chet, it didn't happen.  He was not allowing me to leave that department."  Pl. Resp., Exh. 17, p. 55-56.  Mr. Farrell has admitted that he talked to Brian Johns about Ms. East's interest in the field officer position.  In their reply brief, Defendants argue that "[a]ny reference to Farrell communicating an intent to 'block' East's transfer on the basis of gender is based purely on hearsay and speculation, and should not be considered."  Def. Reply, p. 8.  Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

The question before the Court is whether the hearsay rule precludes Ms. East from testifying as to what Mr. Johns told her, which is that Mr. Farrell blocked Ms. East's transfer. In her Memorandum Opposing Defendants' Evidentiary Objections, Ms. East argues that her testimony is not barred as hearsay on several grounds, each of which the Court finds persuasive.  Defendants offer no reply in support of the hearsay objection.  First, although Mr. Johns' statement to Ms. East indicates that Mr. Farrell blocked the transfer, it does not purport to repeat anything Mr. Farrell said. Therefore, there may not be any out-of-court statement by Mr. Farrell, as required to constitute hearsay under Rule 801.   Second, even if Mr. Farrell told Mr. Johns that he was opposed to the transfer, what Mr. Farrell said is not being offered for the truth of the matter asserted but rather to show the effect on the listener, Mr. Johns, who had the authority regarding the transfer of Ms. East. *See* Fed. R. Evid. 801(c)(2).  Finally, an out-of-court statement by Mr. Farrell, a defendant in this

matter, is not hearsay as a statement made by a party opponent under Federal Rule of Evidence 801(d)(2)(A).  In addition, because Mr. Farrell was an agent/servant of Defendant LCCC at the time he made the statement (if he made any statement) and because the statement concerned "a matter within the scope of the agency or employment," his statement is not hearsay and is admissible.  Fed. R. Evid. 801(d)(2)(D).  Although it does not appear that Defendants are raising a hearsay objection to what Mr. Johns himself told Ms. East, the statement by Mr. Johns, as an agent/servant of Defendant LCCC, is also governed by Rule 801(d)(2)(D).

## MATERIAL FACTS

Plaintiff Lorraine East was an employee of Defendant LCCC from approximately March 2001 through March 2009.  At all times during her employment at LCCC, Ms. East was a part-time custody officer in the LCCC residential facility.

On March 22, 2011, Ms. East signed a form entitled "Conditions of Part-Time Employment," which provides that she, as a part-time employee, understands that "reporting off for a scheduled shift more than twice within a six months[sic] period will, in most cases, result in the termination of [her] association with [LCCC] and the removal of [her] name from the [LCCC] payroll."  Def. Mot., Exh. A.

Ms. East took an extended leave of absence in 2001 and 2002 and another in 2004 or 2005.

By memorandum dated December 1, 2004, Brian Johns, LCCC Director of Field Services, notified LCCC employees that he was looking for part-time field officers.  Having completed the training for the position, Ms. East informed Mr. Johns in a letter dated January 12, 2005, that she was "still" interested in a field officer position.  Pl. Resp., Exh. 19.

During the majority of her term of employment at LCCC, Ms. East's scheduling was managed by Defendant Chet Farrell, who is the Superintendent of Security for LCCC. During her employment with LCCC, Ms. East experienced several medical problems and personal issues that prevented her from working during several separate and distinct periods of time. Ms. East petitioned for and was granted accommodations on several occasions, including schedule modifications and at least one extended leave of absence. During at least part of her term of employment with LCCC, Ms. East maintained primary, full-time employment with the LaPorte County Sheriff's Department and additional part-time employment at a family business. As a result, she frequently had scheduling conflicts that required her to be "off schedule" (meaning unable to be scheduled to work) with LCCC, sometimes for weeks at a time.

Mr. Farrell states in his Affidavit that, as Ms. East's tardiness and absenteeism became more frequent, he compiled a spreadsheet indicating the number of days she arrived late, left early, or called off, including a breakdown of the number of hours Ms. East was scheduled versus the number of hours she actually worked. The document, submitted to the Court, spans the period of July 10, 2006, through February 15, 2009. On some occasions, Ms. East reported off for multiple scheduled shifts, sometimes more than twice within a six-month period. On at least two separate occasions, Ms. East was a "no-call/no-show." However, Mr. Farrell testified that he never "wrote up" Ms. East because of attendance problems.

In approximately October 2006, Ms. East received a schedule modification that allowed her to work an 11 p.m. to 6 a.m. shift instead of an 11 p.m. to 7 a.m. shift. Although she frequently punched out from her shift before 6 a.m. after the schedule change, Ms. East testified that she was given permission to do so.

7

While working under the supervision of Mr. Farrell as a part-time custody officer, Ms. East felt that Mr. Farrell created a hostile work environment such that Ms. East would "give" some of her scheduled shifts to other employees who needed or wanted more time.

During a meeting in the summer of 2008, attended by Ms. East, her attorney Scott King, Mark Murphy, Kellie Bittorf, and Mr. Farrell, discussions were held regarding Ms. East's employment, including her concerns about working under the supervision of Mr. Farrell. The attendees also discussed the potential transfer of Ms. East to LCCC's Female Division, a program that was scheduled to launch in Spring 2009, when a position became available in that division. In her deposition, Ms. East testified that, Mr. Murphy, who is Director of Operations at LCCC, stated at the meeting that "they would allow [Ms. East] to have the top job at top pay with the new female work-release center that was opening up soon." Pl. Resp., Exh. 17, p. 10 (Dep. p. 46). She testified that this was her understanding of Mr. Murphy's promise, but she could not testify that these were his exact words. In contrast, two LCCC administrators present at the meeting recall discussing the potential for a lateral transfer for Ms. East to the Female Division, not a promotion. Ms. East testified that the reason she wanted to leave her position as a custody officer was so that she would not have to work with Mr. Farrell. She also testified that she was interested in a promotion if available.

During the meeting, Mr. Murphy asked Mr. Farrell to leave after the conversation tone began to escalate due to frustration between Ms. East and Mr. Farrell. Ms. Bittorf had the impression from the meeting that there was some conflict between Mr. Farrell and Ms. East. Ms. Bittorf and Mr. Murphy recall that Ms. East would be given an opportunity to transfer to the female division but do not recall authorizing a promotion.

8

In October 2008, Ms. East had a telephone conversation with Mr. Farrell regarding scheduling and the potential for transfer to a field officer position, the position for which she had previously made application to Mr. Johns.  Ms. East testified that Mr. Farrell told her that the field officer position was "a job for a male, and it was a little dangerous."  Pl. Resp., Exh. 17, p. 17 (Dep. p. 53).

Ms. East testified that Mr. Farrell, Mr. Murphy, and Mr. Johns all were aware that she wanted to become a field officer.

Subsequently, Ms. East spoke to Mr. Johns to find out why she could not get transferred to the field officer position, and Mr. Johns told her that Mr. Farrell blocked the transfer.  Mr. Farrell stated in his deposition that he did speak with Mr. Johns about Ms. East's interest in the field officer position and that he told Mr. Johns that he would need to replace Ms. East on his schedule before she could work as a field officer.

Ms. East last worked at LCCC on November 14, 2008.  On November 20, 2008, Ms. East reported off.  Beginning November 24, 2008, Ms. East requested to be off schedule due to an auto accident injury.

In early 2009, Ms. East attempted to communicate with Mr. Murphy about a new job with the Female Division, but he did not return her calls.

Ms. East submitted a Charge of Discrimination dated January 5, 2009, which was received by the Equal Employment Opportunity Commission ("EEOC") no later than January 14, 2009, the date the EEOC provided a Notice of the Charge to LCCC.  In the charge, Ms. East alleges sex discrimination based, among other things, on the refusal to transfer her to a field officer position.  Therein, she referred to a comment made by Mr. Farrell, on approximately October 17, 2008,

indicating that Ms. East "would not be allowed to transfer to a position of Field Officer because as a female [she] would not be able to handle the job." Pl. Resp., Exh. 10 (EEOC Charge).

LCCC's "Respondent's Initial Position Statement" ("Statement"), submitted to the EEOC by counsel in response to the January 5, 2009 charge, is dated February 18, 2009. The Statement shows that copies of the Statement went to Ms. Bittorf, Mr. Murphy, and Leah Johnson from LCCC's attorney. At her deposition, Ms. Johnson did not remember receiving a copy but was not in a position to say she did not receive it. Mr. Murphy stated in his deposition that he did not recall receiving the Statement, but he may have received it. Similarly, Ms. Bittorf stated at her deposition that she does not recall receiving the Statement but could not say that she did not receive it. The EEOC received LCCC's Statement on February 23, 2009.

In mid-February 2009, Mr. Farrell told Yvonne Bryant, Supervisor of Female Services, that there were some "personnel conflicts" related to Ms. East.

In early March 2009, while still on medical leave, Ms. East received a telephone call from Ms. Bryant who indicated that there was a job available for her in the female unit. Ms. East testified that Ms. Bryant advised her that she had been "told . . . by Mr. Murphy to call you, let you know that the facility is up and running, and these are the hours that are available." Def. Reply, East Dep., p. 61 (docket entry 47-1).[1] However, Ms. Bryant did not provide the title, salary, or supervisor of the position. Ms. Bryant told Ms. East to contact Deatrice Woods to discuss those matters. Ms. East testified that Ms. Bryant did not inform Ms. East that she was on the schedule for March 4 and 5, 2009. However, Ms. Bryant testified that the purpose of the call was "to let [Ms. East] know that

---

[1] In support of both the Motion for Summary Judgment and the reply brief, Defendants have submitted exhibits with no identifying letters. Moreover, the deposition excerpts submitted in support of the reply brief contain no cover page identifying who the deponent is or the date of the deposition.

she was scheduled to work the 7:00 to 3:00 shift on Wednesday, March 4th, and 7:00 to 3:00 on Thursday, March the 5th."  Def. Reply, Bryant Dep., p. 7 (Docket entry 47-3).

In her deposition, Ms. East testifies that, at the direction of Ms. Bryant, she then promptly called Ms. Woods, who informed Ms. East that she would not have a new title, rate of pay, or supervisor and that she would still be working under the supervision of Mr. Farrell, going back and forth between the jobs.  Ms. Woods testified that she does not recall providing salary and/or supervisor information to Ms. East.  Based on this information, Ms. East informed Ms. Woods that she would not take the position, and Ms. Woods agreed to notify Ms. Bryant.  Ms. Woods recalls receiving a telephone call from Ms. East but does not recall when it was or what was said.  Ms. Woods' supervisor, Ms. Johnson, testified that Ms. Woods reported the call from Ms. East to her.  Ms. Woods does not remember speaking to Ms. Bryant about Ms. East's call and does not remember agreeing to notify Ms. Bryant of Ms. East's decision not to take the position.

Ms. East testified that, at no time prior to March 4, 2009, did Ms. Bryant inform Ms. East that she was scheduled to work on March 4 and 5, 2009.  Ms. East also testified that, at that time, the employer's doctor allowed her to return to work with restrictions but that her family doctor refused to release her to work.  She testified that she was not officially cleared by both doctors to return to work.  She testified that both her immediate supervisor, James Jenkins, and Mr. Farrell knew that she had not been cleared to return to work.

A letter dated March 5, 2009, from Ms. Bryant to Ms. Johnson provides that Ms. East was scheduled to work the 7:00 a.m. to 3:00 p.m. shift on March 4 and 5, 2009, but that she did not report for either shift.  The letter further states that Ms. East did not inform Ms. Bryant that she was

calling off for either shift and that Ms. Bryant was not aware that Ms. East had reported off to anyone at the LCCC facility.

Ms. Johnson does not recall investigating the matter addressed in Ms. Bryant's March 5, 2009 letter, even though that would have been her normal practice.   In a letter dated March 17, 2009, Ms. Johnson informed Ms. East that her employment with LCCC was terminated effective that date because of her "continuous pattern and history of failing to report to work for scheduled shifts, coming in late to work and leaving [her] shifts early." Def. Br., Exh. D., p. 2.  Ms. Johnson did not discuss the matter with Ms. East until after Ms. East received the letter of discharge.  If Ms. East in fact told Ms. Woods, during their telephone conversation prior to March 4, 2009, that she would not be reporting work on March 4 and 5, 2009, Ms. Johnson testified that she did not know whether there were grounds for discharge; it might have been a "closer call."  Pl. Br., Exh. 7, pp. 27-28.

Some time prior to March 17, 2009, Ms. Bryant learned from Mr. Murphy that Ms. East had been fired.  Around March 8, 2009, Ms. Bryant prepared the custody officer schedule for the period beginning March 13, 2009, and Ms. East was not included on the schedule.  Ms. Bryant does not recall whether she was aware that Ms. East had been fired when she prepared the schedule for March 13, 2009, but does state that she did not include Ms. East on the schedule because Ms. East had failed to show on March 4 and 5 and that she was probably unaware of Ms. East's status at the time.

On March 30, 2009, Ms. East filed a second Charge of Discrimination with the EEOC for retaliation based on her termination.

The facts of record are unclear as to whether Ms. East was scheduled to work March 4 and 5, 2009.  In her Affidavit, Ms. Bryant states that the initial schedule for the new Female Division was issued in mid-February and covered the first few weeks of March 2009.  She states that she

received a copy of the initial schedule from Mr. Farrell, who created it due to his experience with scheduling officers in the Male Division. Ms. Bryant states that, because she observed that Ms. East was scheduled to work on March 4 and 5, 2009, Ms. Bryant contacted Ms. East a few weeks in advance to advise her of the dates she was scheduled to work. Yet, Mr. Farrell states that he did not prepare the initial schedule for the Female Division for the first week in March: "I have never done any of their scheduling ever." Pl. Resp., Exh. 5, p. 6 (Dep. p. 43, l. 8-9). Mr. Murphy testified that he never saw a schedule for the Female Division that included Ms. East. Although requested in discovery by Ms. East, the schedules for the Female Division for this time period were not provided until the deposition of Ms. Bryant on May 24, 2011, who said she located the schedules "[a]bout three weeks ago" in a "file cabinet." Pl. Resp., Exh. 4, p. 9 (Dep. pp. 19-20). The schedule shows the "FWR Schedule" from March 2, 2009, to March 15, 2009, and, at the top, provides: "Printed on 05-Mar-09 - For internal use only". Pl. Resp., Exh. 15. "East" is listed to work March 4 and 5 from 7 a.m. to 3 p.m.

The written job descriptions for the positions of custody officer and field officer show a difference in the "Essential Functions and Performance Responsibilities," with the field officer having more functions and responsibilities.

Section 3 of the Lake County Employee Handbook requires that (i) all disciplinary action, including a verbal reprimand, be documented by completion of the "County's Disciplinary Action Form," signed by the supervisor and the disciplined employee; (ii) an employee who is disciplined be given an "opportunity to respond, explain or comment in writing when discipline is issued," (iii) "progressive disciplinary" measures be utilized when there are two disciplinary violations within 12 months, suggesting prior actions are not considered if more than 12 months have passed; and (iv)

the supervisor "document and file the disciplinary action taken within five (5) working days of notification of the incident," with the "[f]ailure to act within this period [rendering] the action moot and without force or effect."  Pl. Br., Exh. 21, pp. 39-41.

## ANALYSIS

Defendants LCCC and Mr. Farrell seek summary judgment on all of Ms. East's sex discrimination and retaliation claims.  The Court considers each claim in turn.

### A.  Sex Discrimination

In her Amended Complaint, Ms. East alleges that she was discriminated against based on her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., and her equal protection rights under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.  Title VII makes it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Fourteenth Amendment prohibits state and local governments from denying any person "the equal protection of the laws," which includes discrimination based on sex.  U.S. Const. amend. XIV, § 1; *see also Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986).  Pursuant to 42 U.S.C. § 1983, an individual may bring an action for a violation of the Fourteenth Amendment against defendants acting under color of state law.  A claim of individual liability under § 1983 must be based on a finding that the defendant caused the deprivation of a federal right.  *Ortiz v. City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011).

14

A plaintiff alleging sex discrimination under Title VII or § 1983 can establish her claim under either the direct method or under the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Makowski v. SmithAmundsen LLC*, — F.3d —, —, 2011 WL 5443617, at *5 (7th Cir. Nov. 9, 2011); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n. 2 (7th Cir. 2006) (noting that the analysis for a claim under Title VII and a claim under § 1983 is the same and that the only difference is who can be named as a defendant under each). In this case, Ms. East is proceeding solely under the direct method and, thus, "must demonstrate a triable issue as to whether discrimination motivated the adverse employment action of which [she] complains." *Davis v. Time Warner Cable of Se. Wis.*, 651 F.3d 664, 672 (7th Cir. 2011) (citing *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)).

Under the direct method, a plaintiff may offer direct or circumstantial evidence. Direct evidence is that which would prove discriminatory intent without reliance on inference or presumption by the trier of fact. *Makowski*, — F.3d at —, 2011 WL 5443617, at *5 (citing *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003)). A plaintiff may also demonstrate a causal link by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook Cnty.*, 463 F.3d 773, 779-80 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Courts have recognized three types of circumstantial evidence. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008). First, the most common "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d

15

853, 862 (7th Cir. 2007) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).  Second, the plaintiff can offer evidence that similarly situated employees outside the protected class received systematically better treatment.  *Id.*  "The third is evidence that the plaintiff was qualified for the job in question but passed over in favor of a person outside the protected class and that the employer's stated reason is a pretext for discrimination."  *Petts*, 534 F.3d at 721 (citing *Hossack*, 492 F.3d at 862; *Troupe*, 20 F.3d at 736).

In this case, Ms. East relies on the comment made by Mr. Farrell in mid-October 2008 during a discussion with her about her request to transfer to a field officer position.  Ms. East has testified that Mr. Farrell told her that she would not be transferred to a field officer position because it was a job for a male.  Subsequently, Mr. Johns told Ms. East that she was not getting a field officer position because Mr. Farrell was "blocking" her candidacy.  Mr. Johns was the Director of Field Services to whom Ms. East was directed when she expressed an interest in the field officer position. The combination of these statements constitutes direct evidence that "discrimination motivated the adverse employment action."  *Davis*, 651 F.3d at 672.

Defendants attempt to portray Mr. Farrell's comment, which he denies even making, as a "stray remark" made by an individual who did not have the authority to make the challenged employment decision.  *See Nichols v. S. Ill. University-Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment.").  This argument fails in light of Mr. Johns' statement to Ms. East that Mr. Farrell was blocking her transfer.  An employer is liable if "one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action."  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011); *see*

16

*also Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008) ("Derogatory remarks are relevant if they are made by someone who provided input into the adverse employment decision."); *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 829 (7th Cir. 2008) (finding that there was no evidence that the individuals who made derogatory remarks had any influence over the adverse employment action); *David v. Caterpillar, Inc.*, 324 F.3d 851, 861 (7th Cir. 2003) (recognizing that the "retaliatory motive of a 'nondecisionmaker' may be imputed to the company where the 'nondecisionmaker' influenced the employment decision by concealing relevant information from, or feeding false information to, the ultimate decisionmaker").

Although Mr. Johns, and not Mr. Farrell, had the authority to decide who would be a field officer, Mr. Johns essentially told Ms. East that his decision was impacted by Mr. Farrell's input. *Staub*, 131 S. Ct. at 1194 (holding that, "if a supervisor performs an act motivated by anti-military animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the Uniformed Services Employment and Reemployment Rights Act]").  It is irrelevant that Mr. Johns may not *himself* have made the decision based on sex discrimination; what matters is whether Mr. Farrell had an impermissible motive in "blocking" Ms. East's transfer when he communicated with Mr. Johns.  Although a jury may find that Mr. Farrell blocked Ms. East's transfer based on her history of habitual tardiness and absenteeism, a reasonable jury could also conclude that Mr. Farrell blocked Ms. East's transfer to the field officer position because she is a female.

Defendants argue that Ms. East's discrimination claim must also fail because she did not suffer a materially adverse employment action, reasoning that the refusal to transfer Ms. East from a custody officer position to a field officer position was not an adverse employment action.  Ms. East

17

agrees that, "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable. But 'by and large' differs from 'never.'" *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (addressing a retaliation claim). An adverse employment action "must materially alter the terms and conditions of employment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (quoting *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001)). The Seventh Circuit has recognized three oft-cited categories of such materially adverse employment actions for purposes of Title VII:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nagle*, 554 F.3d at 1116 (quoting *Nichols*, 510 F.3d at 780). An employee's "subjective impression about the desirability of [a position], without more, is insufficient to show discriminatory intent under the direct method." *Id.* at 1117 (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)).

Ms. East argues that the denial of transfer to a position as a field officer falls within the third category as well as the second. Ms. East began seeking a transfer out of her position as custody officer prior to January 2005 because of what she perceived to be an intolerable situation due to Mr. Farrell's treatment of her. She argues that a jury could find that the circumstances of the transfer denial subjected her to "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment–an alteration that can fairly be characterized as

18

objectively creating a hardship, the classic case being that of an employee whose desk is moved into a closet." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002).  Ms. East notes that  the work environment created by Mr. Farrell was bad enough at times to cause her to find a substitute to avoid him.  Therefore, she reasons that being assigned to work for Mr. Farrell actually caused her to lose wages because she worked less hours.  In addition to her own testimony, Ms. East points to Mr. Murphy's awareness of the tension between Ms. East and Mr. Farrell at the time of the late summer 2008 meeting at which Mr. Murphy asked Mr. Farrell to leave.  Ms. Bittorf also recognized the tension between Mr. Farrell and Ms. East at that time.

Ms. East suffered a negative alteration in her workplace environment by being denied an opportunity to leave the tense work environment with Mr. Farrell.  This is not simply Ms. East's subjective impression about the desirability of the custody officer position or her subjective preference for one position over another.  In fact, she testified that she liked her job as a custody officer.  Pl. Br., Exh. 17, p. 14 (Dep. p. 50) ("I loved the job."; "I loved everybody.  It's just Farrell, Chet Farrell."; "I wanted out away from him."); *see also Herrnreiter*, 315 F.3d at 745 (confirming that the denial of a lateral transfer when the plaintiff has merely a "purely subjective preference for one position over another" is not a materially adverse employment action).  However, the difficult work situation with Mr. Farrell led Ms. East to seek transfer to another position–the field officer job.  A reasonable jury could accept Ms. East's assessment of the situation, as recognized by Mr. Murphy and Ms. Bittorf, and find that she suffered a materially adverse employment action by not being transferred out of the work environment with Mr. Farrell.

Ms. East argues that a reasonable jury could also find that the denial of her request for transfer fits within the second category of cases "in which a nominally lateral transfer without a

change in financial terms significantly reduces the employee's career prospects by preventing her from using the skills in which she is trained and experienced."  Ms. East underwent training to be a field officer.  Ms. East suggests, albeit without specific explanation, that a comparison of the job descriptions of "field officer" (Ms. East's desired job) and "custody officer" (Ms. East's then-current position) reveals that a field officer has substantially more duties and responsibilities than a custody officer.  The Court's comparison of the descriptions demonstrates that, while both positions involve supervision of offenders and involve a few identical duties, the position of field officer indeed offers more duties and responsibilities in multiple environments.

The functions and responsibilities of the custody officer position require the employee to supervise residents and maintain secure and orderly operation of the facility, conduct hourly rounds, log resident activity, organize and distribute resident work assignments, enforce the resident disciplinary system, document all incidents and unusual events, monitor all on-site resident activities, monitor the visitation process, and monitor the maintenance of the facility.

In contrast, the field officer position (listed as "Case Managers–Field Division") includes "administrative functions" and requires the employee to conduct home visits and/or make telephone contacts with each participant, inspect electronic equipment to ensure it has not been tampered with, contact participants randomly to ensure that the equipment is functioning properly, install and remove home detention electronic devices from a participant's home as ordered by the court, review and report progress of all participants in the case file, write reports whenever necessary, make recommendations to the Correctional Services Manager regarding the reliability of electronic equipment and whether any problems occur in supervising offenders, perform data entry of offenders relating to schedule changes, monitor participants to ensure compliance with program rules, collect

20

and compile program data for submission to the Correctional Services Manager, meet with case managers regarding the status of participants, and testify in court whenever necessary.

Ms. East reasons that a transfer to the field officer position would have enhanced her career prospects due to the broader range of duties and responsibilities. Defendants do not contest these facts or arguments in reply. In her deposition, Ms. East testifies that, although her primary motivation in seeking a transfer from her then-current position was to get away from Mr. Farrell, she was also interested in a promotion and that since she had been with LCCC since 2001, "it was time for [her] to . . . grow with the company." Pl. Br., Exh. 17, p. 14 (Dep. p. 50).

Viewing the evidence in the light most favorable to Ms. East, questions of material fact exist as to whether she suffered a materially adverse employment action by being denied a transfer to the position of field officer. This is not simply a case of an "ostensibly lateral transfer" with no "loss in pay, benefits or title" or any other actionable differences. *See Tart*, 366 F.3d at 476 (finding a materially adverse employment action when the employees' work area was moved to a "cold, wet, muddy trench," they "lost the one-man truck and the work that went with it," and they "lost their computers, their independence, customer contact and their skilled job duties"); *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir. 1987) (finding a materially adverse employment action when a library consultant was transferred to a reference position and lost her office, her telephone, business cards, listings in professional publications as a library consultant, and the responsibilities of consulting in exchange for reference work). Therefore, summary judgment is denied on Ms. East's sex discrimination claims.

**B. Retaliation**

Ms. East brings her claim of retaliation under Title VII as well as the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. The Court addresses each in turn.

*1. Title VII Retaliation Claim*

Retaliating against an employee for engaging in protected activity is prohibited by Title VII. 42 U.S.C. § 2000e-3(a); *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). As with discrimination claims, an employee alleging retaliation may proceed under the either direct or indirect method. *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011). Again, Ms. East proceeds solely under the direct method. "To avoid summary judgment on a retaliation claim under the direct method, [Ms. East] must produce evidence from which a jury could conclude: '(1) that she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) there was a causal link between the two.'" *Bernuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011) (quoting *Silverman*, 637 F.3d at 740). A plaintiff relying on the direct method of proof may establish the causal link with direct evidence or by demonstrating "a 'convincing mosaic' of circumstantial evidence" that would permit an inference of discrimination. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (quoting *Rhodes*, 359 F.3d at 504 (quoting *Troupe*, 20 F.3d at 737)).

In this case, it is undisputed that Ms. East satisfies the first two prongs of the analysis. First, she filed a charge of sex discrimination with the EEOC, which is a protected activity. *Bernuzzi*, 647 F.3d at 664 (citing *Silverman*, 637 F.3d at 740). Second, she was discharged from her employment, which constitutes a materially adverse employment action. *Burnell v. Gates Rubber Co.*, 547 F.3d 704, 709 (7th Cir. 2011).

22

Therefore, the remaining issue is whether Ms. East has raised a genuine issue of material fact as to a causal connection between her protected activity and her termination. Because Ms. East offers only circumstantial evidence of this causal connection, the Court again notes, as set forth in Part A above, that there are three types of circumstantial evidence, one of which includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *See Petts*, 534 F.3d at 721. The Court finds that Ms. East has offered sufficient evidence for a jury to find a causal connection between her protected activity and her discharge to survive summary judgment.

First, "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (citing *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)). Nevertheless, "occasionally . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Id.* (citing cases). In this case, little time passed between the time that the decisionmakers (Ms. Bittorf, Ms. Johnson, and Mr. Murphy) would have learned of Ms. East's sex discrimination charge and the termination of her employment. The jury must decide when and if the decisionmakers learned of Ms. East's sex discrimination charge. Ms. Bittorf, Ms. Johnson, and Mr. Murphy all testified that they did not remember receiving a copy of LCCC's Statement sent to the EEOC, notwithstanding the listing of their names on the cover letter as receiving a copy of the Statement, but also could not say that they did not receive it. The Statement is dated February 18, 2009, and the EEOC received it on February 23, 2009. If the jury decides that the decisionmakers became aware of Ms. East's charge during the same time period, which is shortly before the early-

23

March conversation with Ms. Bryant and shortly before March 4, 2009, the first date Ms. East did not appear for work for which she was allegedly scheduled, the jury could reasonably infer a causal connection.  Although this timing is not as close as the immediate termination upon receipt of a written complaint in *Loudermilk*, the Court nevertheless finds that the timing is sufficiently close under the circumstances that an inference of causation is reasonable and that "[a] jury, not a judge, should decide whether the inference is appropriate."  *Id.*

Second, there is conflicting evidence as to who prepared the schedule for the first week of March 2009, which is the week that Ms. East was allegedly scheduled to work.  Ms. Bryant testified that Mr. Farrell prepared the schedule; however, Mr. Farrell testified that he never prepared the schedule for the Female Division.  When this disparity is combined with Ms. East's testimony that she was never told to report for work March 4 and 5, 2009, the delay in providing a copy of the March 4 and 5, 2009 schedule to Ms. East during the course of discovery in this litigation, and Ms. East's testimony that she was not released to return to work by her doctor by March 4, 2009, a reasonable jury could infer that Ms. East's alleged failure to report for work and the grounds for her discharge are unfounded.

Finally, Ms. East notes that LCCC failed to comply with the disciplinary procedures set forth in Section 3 of its Employee Handbook.  As set forth in the material facts above, the Handbook sets forth a detailed and progressive system of discipline based largely on written documentation and communication with the employee that appears not to have been followed in this case.  Although this is not a basis of Ms. East's claim, she argues that this apparent irregularity provides a further basis from which a jury could infer a retaliatory motive.  Defendants reason that the "Conditions of Part-Time Employment" Ms. East signed at the time of her hire, which provides for the possibility

24

of termination if a part-time employee reports off for a scheduled shift more than twice in a six-month period, supercedes the more general disciplinary policies of the Handbook.  However, prior to filing her EEOC charge, Ms. East had reported off for a scheduled shift or not shown up for a shift more than twice in a six-month period without formal disciplinary action being taken or the termination of her employment.

Defendants argue generally that suspicious timing alone is insufficient to establish a genuine issue of material fact for trial, yet Ms. East has provided more than suspicious timing.  Defendants also suggest that Ms. East has essentially described a situation in which a lack of clear communication between all parties led to a general lack of understanding regarding the true intentions and expectations of the parties related to her return to work in March 2009.  For example, Defendants reason that, because Ms. Bryant had no previous communication with or exposure to Ms. East, she had no reason to act with retaliatory intent.[2]  Or perhaps Defendants will elicit convincing testimony at trial that the decisionmakers were in fact not aware of Ms. East's EEOC charge.  *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (noting that a necessary component of intentional discrimination by the decisionmaker is that the decisionmaker had actual knowledge of the plaintiff's complaints).  But these are issues for the jury to decide.

At this summary judgment stage, Ms. East has offered a sufficiently convincing mosaic of circumstantial evidence to raise a genuine issue of material fact as to the causal connection between

---

[2] Defendants assert, without citation to record evidence, that Ms. Bryant had no prior communication with or exposure to Ms. East.  Upon the Court's review, there is no support for this fact in Ms. Bryant's Affidavit submitted by Defendants in support of their motion.  However, Ms. Bryant does state in what appears to be an excerpt of her deposition transcript (it is unlabeled and does not include the first page of the deposition) offered in support of Defendants' reply brief, that when she called Ms. East, presumably in March 2009 (the transcript submitted does not include the prior page that would contain this information), she "[p]robably introduced [herself], because I had not met her."  Def. Reply, p. 1 (p. 7 of deposition transcript) (Docket entry 47-3).

her protected activity and her termination under all the facts presented that would allow a jury to infer intentional retaliation in this case.[3]  Therefore, summary judgment on Ms. East's retaliation claim under Title VII is denied.

*2.  First Amendment Claim*

To survive summary judgment on a § 1983 claim of unlawful First Amendment retaliation, a public employee is required to put forth evidence presenting a triable issue of fact that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation as a result of her employer's action; and (3) the protected speech was the cause of the employer's action.  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 500-01 (7th Cir. 2010).  Although Defendants state that they seek summary judgment on all of Ms. East's claims, Defendants do not analyze, much less mention, Ms. East's First Amendment claim or the applicable legal standard.  Thus, the Court finds that Defendants are not seeking summary judgment on Ms. East's retaliation claim brought under the First Amendment pursuant to § 1983.[4]  Therefore, the claim remains for trial.

---

[3]  In their reply brief, Defendants cite extensively to case law discussing the second and third steps of the burden-shifting analysis under the indirect method established in *McDonnell Douglas*.  *See* Def. Reply, pp. 4-7 (setting forth law in a section entitled "Failure to Establish Pretext") & pp. 9-10 (discussing the analysis of an employer's legitimate non-discriminatory reason for the employment action and whether a plaintiff has demonstrated that the given reason is a pretext for discrimination).  However, Ms. East is not proceeding under the indirect method, which requires a comparison of Ms. East's circumstances with a similarly situated individual outside of the protected class.  *See, e.g.*, *Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010) (cited by Defendants) (setting forth the three steps of the burden-shifting method as well as how to proceed under the pretext analysis at the third step).  Nor is Ms. East, in proceeding under the direct method, relying on forms of circumstantial evidence that involve a similar inquiry into a pretext analysis.  *See supra* Part A (citing *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008), for the three types of circumstantial evidence, the second and third of which both involve comparison of the plaintiff with others outside the protected class and with the third also considering whether the stated reason for choosing someone else outside the protected class over the plaintiff is a pretext for discrimination).

[4]  The Seventh Circuit Court of Appeals has cautioned against using the term "First Amendment retaliation claim" because the "infringement on First Amendment rights occurs both when employers deter future speech as well as when they punish past speech."  *Id.* at 501 n. 9.  However, the present case concerns an alleged punishment of past speech.

26

However, Defendants do argue in their Motion for Summary Judgment that there is no evidence connecting Defendant Chet Farrell to Ms. East's termination.  Ms. East has not responded with any evidence to raise a genuine issue of material fact to connect Mr. Farrell to her termination in retaliation for her protected activity.  Accordingly, the Court grants summary judgment in favor of Defendant Chet Farrell as to Ms. East's retaliation claim brought under the First Amendment pursuant to § 1983.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment [DE 42] and **DENIES as moot** the Motion for Summary Judgment [DE 38].  The Court grants summary judgment in favor of Defendant Chet Farrell on Plaintiff Lorraine East's First Amendment claim brought under § 1983 and denies summary judgment as to all other claims against Defendants Lake County Community Corrections and Chet Farrell.

The Court **REAFFIRMS** the final pretrial conference set for **December 16, 2011, at 9:30 a.m.**, and the trial setting of **January 23, 2012**.

So ORDERED this 14th day of December, 2011.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record

27